The petition charges desertion in the month of September, 1924, when the parties were residing at 27 Belleville avenue, Newark, New Jersey.
The evidence shows that in September, 1924, the husband was admitted to Glen Gardner for lung trouble, where he remained *Page 231 
for seven months. When he was well enough to leave, he returned to his wife and two children, who, in the meantime, had moved to 21 Schuyler street, Belleville, New Jersey, where they lived with petitioner's father. After living at Schuyler street a while, the parties purchased a home at 245 Linden avenue, Belleville, New Jersey. The father went there to live with them. They continued to live "under the same roof" at 245 Linden avenue, Belleville, New Jersey, to September 1st, 1928, or, as petitioner testifies, "up until the time I left him." Petitioner then moved to Warren street, Newark, New Jersey, and went to work in a factory. She had not previously worked, so far as the evidence discloses.
Petitioner claims that she and her husband had no marital relations after September, 1924. She says that her husband slept in the attic. She does not say where she slept. In September, 1928, petitioner says, "I just packed my things and left — that's all." Her father left at the same time and went to live at Lincoln Park. Presumably, the defendant continued to live at 245 Linden avenue, Belleville, New Jersey.
The desertion in this case is based entirely upon cessation of marital relations. The only other witness is petitioner's father, and, if there is any corroboration, it must be found in the father's testimony. I can find none, except that the father says that defendant slept in the attic. On the contrary, the father says (page 49):
"Q. What was he looking for?
"A. He was looking for intercourse with her and she said, `Oh, go to bed.'"
This evidence contradicts the defendant's refusal to cohabit. The only other evidence which petitioner's solicitor says is tantamount corroboration is the answer to a question put to the father as to whether his daughter was willing "to have sexual relations."
"I think likely she was willing — I suppose if he was with her — all right, I suppose she was willing, so far as I know."
As I have pointed out, the theory of the case rests upon cessation of sexual relations. Nowhere does the petitioner testify that she sought such relations with her husband, nor does it appear that the husband declined. *Page 232 
It is true that the father says the defendant "was going to kill her with an ax." The petitioner does not refer to this instance. She says her husband struck her only once.
Petitioner's solicitor in his brief goes entirely outside of the evidence and says, "the fact is that, after petitioner had learned that defendant had contracted a venereal disease and accused him, he not only admitted it but said then and there that he would give it to her." While that may be true, it does not appear in the evidence.
Petitioner's solicitor also says in his brief that the incident — "the little incident referred to by the father, was after the two-year period, when the petitioner had acquired a vested right to a divorce and just before she left, she was justified in refusing." This assertion is not supported by the evidence.
Solicitor's brief also says that petitioner has tuberculosis and is now confined in the tubercular ward of the Verona sanitarium, where she went the day after the hearing, and that "she would be in bed for several months." Neither is this assertion supported by the evidence.
The special master reported adversely for two reasons: (a) "That the petitioner had only proved residence down to the time of the commencement of this action and not up to the date of the hearing. The petitioner walked out of the house on September 1st, 1928, and verified her petition on September 18th, 1928." I think the conclusion of the master as to the proof of residence is clearly inaccurate. While there is no corroboration of residence from September 1st, 1928, to the date of the hearing, December 13th, 1928, that fact is immaterial. (b) "That the testimony of the petitioner was so confusing and full of discrepancies that I can therefore not place much credence on what she says." The special master's characterization was moderate.
Petitioner was either confused or a very sick woman. And her father's evidence is not any more reliable.
Petitioner's solicitor depends upon Haskell v. Haskell,99 N.J. Eq. 399, and says: "This case is in every way much stronger than the Haskell Case." I was the special master in theHaskell Case and reported favorably. The advisory master overruled the report and advised the dismissal of the *Page 233 
petition. The court of errors and appeals set the order aside and affirmed the report of the special master. In that case there was considerable corroborative evidence.
In my opinion, the special master's conclusions on the evidence should be sustained. This does not mean, however, that the testimony of the petitioner cannot be further corroborated. Her fourteen-year-old son lived with her and her husband constantly and he certainly knows where he slept, where his father slept and where his mother slept. Petitioner says nothing about this phase of the case.
She should be recalled at the earliest opportunity for that purpose. It is also possible, it seems to me, to produce the evidence of a woman named Luigi, with whom the petitioner went to live after September 1st for a short time.
I suggest, therefore, that an opportunity be afforded the petitioner to produce further evidence, and that the decision on the exceptions be reserved until the coming in of a further report.